CLERK'S COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FEB - 7 2000


CLERK

KEVIN A. DeHAAN, individually,
and as next friend of REBECCA
ANNE DeHAAN, his daughter,

Plaintiffs,

v.                                          No. CIV 98-1151M/DJS-ACE

UNITED STATES OF AMERICA,

Defendant.

## MEMORANDUM OPINION AND ORDER

This case comes up on Defendant's Motion to Dismiss. After receiving the motion, the parties were advised that because of the affidavits accompanying the motion, the motion pursuant to Fed. R. Civ. Proc. 12(b) would be treated as a motion for summary judgment pursuant to Rule 56, and the parties responded accordingly.

I have now received all responses and replies and determine that the motion for summary judgment should be granted. I find and conclude that Plaintiffs complain of wholly discretionary acts expressly excepted by the Federal Tort Claims Act, and therefore, beyond the recovery of damages by reason of sovereign immunity.

### Nature of the Case

Plaintiffs bring this action pursuant to the Federal Tort Claims Act, 28 U.S.C. sec. 2671 *et. seq.* They alleges that Plaintiff Kevin DeHaan and his daughter, Rebecca DeHaan, have suffered personal injuries as a result of a 1994 United States Air Force decision to transfer

Plaintiff Kevin DeHaan's former wife, Karen Sullivan, and Rebecca to an undisclosed location where DeHaan could not find or communicate with them. DeHaan contends that in addition to causing a wrongful termination of his position with the federal government, the move interfered with his custodial rights and caused him both loss of consortium and severe emotional distress.

Defendant opposes these allegations and files its motion to dismiss on grounds that (1) moving Plaintiff's former wife and daughter was an effort to protect them from the Plaintiff who had physically threatened and harmed his wife, and (2) transferring Plaintiff's wife and daughter into the Threatened Airman's Program and removing them from New Mexico was wholly discretionary, so that (3) by reason of the discretionary function exception to the Federal Tort Claims Act, any injuries claimed by the Plaintiffs are not actionable.

Defendant contends that DeHaan threatened Sullivan, who was then serving with the United States Air Force at Holloman Air Force Base, New Mexico, with deadly force. According to Defendant, when Sullivan's commanding officer became aware of the alleged threats and other allegations of harm to Sullivan, including a stabbing incident and stalking, he abruptly moved Sullivan and her daughter out of New Mexico and then refused to provide any information to the Plaintiff about their location. Although DeHaan was prevented from contacting his minor daughter for an extended period of time, Defendant contends, first, that the actions of Sullivan's commanding officer were discretionary and, regardless of the consequences, not subject to a tort claim, and secondly, the actions complained of were completely justified by the circumstances. "The life of SrA Sullivan was endangered," states Defendant in its pending motion, "and no other foreseeable recourse was available [other than the transfer] due to the severity of Mr. DeHaan's threats and actions."

## Standards of Review

### A. The Discretionary Function Exception

The Federal Tort Claims Act states that the United States is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. sec. 2680(a). This exception for discretionary functions expressly limits the waiver of sovereign immunity contained in the Tort Claims Act. United States v. Varig Airlines, 467 U.S. 797 (1984); United States v. Gaubert, 499 U.S. 315 (1991); Berkovitz v. United States, 486 U.S. 531 (1988). It applies, however, only in those instances where (a) the challenged decision involves an element of judgment, and (b) the choice to be made is not dictated by federal law or policy. Kiehn v. United States, 984 F. 2d 1000, 1102 (10th Cir.1993). It does not apply unless the conduct challenged is by its nature susceptible to policy analysis. United States v. Gaubert, supra.

The purpose of the exception is to "prevent judicial 'second-quessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . ;" United States v. Gaubert, supra at 323; and it is "the nature of the conduct, rather than the status of the actor" that determines whether or not the discretionary function exception applies. United States v. Varig Airlines, supra at 813. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" United States v. Gaubert, supra at 322, quoting Berkovitz v. United States, supra.

3

> Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. [Cite omitted.] If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations. United States v. Gaubert, supra at 324.

In order to survive a motion to dismiss, then, a plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id. at 324-325. In making this determination, the first pertinent question is whether the challenged actions were controlled by *mandatory* statutes or regulations or were a matter of choice. Id. at 330. The second question asks whether the choice was of a policy-making nature or involved the exercise of a policy judgment. Id. at 331-332.

Neither of these inquiries exclude "day-to-day 'operational' decisions," even where such decisions are negligent. Id. at 332-334. Day-to-day operational decisions can be taken "for policy reasons;" and when they are, they come within the discretionary function exception. Id. "[A]ction 'outside the purview' of the relevant policy does not necessarily fail to qualify for the discretionary function defense. If the action involves policy discretion, and the officer is authorized to exercise that discretion, the defense applies even if the discretion has been exercised erroneously. . . ." Id. at 338, concurring opinion of Justice Scalia. Thus, in operational

4

decisions undertaken for reasons of public policy, whether the negligence is said to have occurred "in the course of establishing broad policies" or in individual acts "in the course of day-to-day activities," allegations of negligence without more are legally insufficient to establish a cause of action. Id. at 334.

## B. Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, a court determines "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." Thrasher v. B&B Chemical Co., 2 F.3d 995, 996 (10th Cir. 1993). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus.Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, Harsha v. United States, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Where a moving party thus demonstrates an absence of evidence and the nonmoving party fails to provide a sufficient showing as to an essential element of the case with respect to which the moving party has the burden of proof, the moving party is entitled to judgment as a matter of law. Id.

## Plaintiffs' Motion to Strike
## Declaration of James P. Hunt and Sullivan Affidavit

In conjunction with its response to Defendant's Motion to Dismiss, Plaintiffs move to strike the Declaration of Col. James P. Hunt and a portion of the Affidavit of Kristen Sullivan on grounds that statements contained in these documents are conclusory in nature and not made on personal knowledge. Clearly, personal knowledge is required. Fed. R.Civ. P. 56(e). Plaintiffs also are correct that facts which appear to be grounded solely in hearsay appear in both affidavits; and Plaintiffs accurately observe that both affidavits contain conclusory statements which are not only improper and but also of no help to a determination of the issues.

Defendant responds by refiling the Hunt statement in affidavit form, with an added provision that it is made under penalty of perjury. Defendant fails, however, to address other of Plaintiffs' contentions or the conclusory nature of the statements made and simply repeats the statements at issue as if they were entitled to reliance. Hunt's declaration includes, for example, a statement that he "became personally aware of Mr. Kevin DeHaan's continued deadly threats to SrA Sullivan coupled with Mr. DeHaan's outrageous behavior relating to a car bomb incident multiple death threats a stabbing incident, drug incident and several assaults and batteries and stalking events extremely deleterious to SrA Sullivan." Yet, in spite of Plaintiff's objections, Hunt declines to say he witnessed these events and he provides nothing to explain how he became "personally aware." Thus, on the record as it stands at this point, the only reasonable inference is that Hunt has based his entire declaration and everything he believed to be true about the facts of this case on hearsay.

The same is true for most of the Affidavit of Charles W. MacDonald filed by Defendant

in response to the Motion to Strike. Filed after the Motion to Strike, the new affidavit is not included in Plaintiffs' motion, but I consider it with the motion because it also indicates a basis in hearsay and contains countless conclusory statements. Again, by rules of procedure and evidence very little of the MacDonald affidavit can be considered and what is to be utilized can be directed only for very limited purpose.

A statement of personal knowledge in the MacDonald affidavit which I find pertinent to the Motion to Dismiss (and Summary Judgment) and not disputed by the Plaintiffs is the indication (in paragraph 4) that: "We were aware of the potential criticism and liability if something were to happen to SrA Sullivan or her child when we knew of the danger, but had failed to act. Our desire to protect SrA Sullivan from Mr. DeHaan motivated our non-labor actions with respect to the Sullivan-DeHaan situation." I find this statement relevant to state of mind and the exercise of judgment without regard for whether or not allegations regarding DeHaan were true or investigated. The only other statement I have considered in the MacDonald affidavit concerns involvement of the AFOSI in Sullivan's case prior to her reassignment to the TAP. I accept MacDonald's references to some degree of AFOSI interaction, and additionally, I accept that the affiant knew this from his own conversations with an AFOSI agent.

I conclude as to both the MacDonald and the Hunt affidavits that because they are conclusory in nature and for the most part not based on personal knowledge, they can be considered solely for very limited purpose. This purpose certainly does not include the truth of the allegations that DeHaan constituted a real and imminent threat to Sullivan's safety. The affidavits are considered primarily for no more than demonstrating the actors' state of mind at the time.

I also view Hunt's statements as establishing some reasonable negative inferences, principle among them that Hunt acted at the time in question on facts as he understood them and that he himself did not conduct an investigation. I understand from the nature of the conclusory statements made and from statements glaringly absent from Hunt's declaration that he conducted no interviews, collected no documents (such as copies of state court restraining orders or police reports) and did nothing to acquire objective evidence to support the allegations received.

The affidavit of Major Humberto Morales, also filled with conclusory statements as opposed to enumerating factual events from first-hand knowledge, supports Hunt's failure to inquire independently into the allegations against DeHaan and the reasonableness of Hunt's subjective belief in a danger posed to Sullivan. Morales describes himself as the Detachment Airman of the Office of Special Investigations at Holloman Air Force Base and states that his responsibilities included "doing threat verifications for Airman being considered for enrollment in the Threatened Person's Assignment Program . . . ."

DeHaan disputes that AFOSI verified Sullivan to be in real physical danger, but Morales avers to the contrary. Morales states that he was "tasked with verifying whether or not SrA Kristen Sullivan's exhusband, Mr. Kevin L. DeHaan, was threatening SrA Sullivan to the extent that she needed to be enrolled in the TAP." Again, much of what Morales includes in his affidavit must reasonably be regarded as coming from statements made to him by another. Some of the affidavit, however, is useful for the limited purposes here posed, as well as demonstrating Hunt's decision as an exercise of judgment. Even though verification of threats and harm to Sullivan by AFOSI remains a fact in dispute and cannot be accepted as established by the Morales affidavit, the affidavit is considered as support for Hunt's decision and his state of mind

at the time, Hunt's reasonable belief that he was acting in accordance with TAP protocol and the exercise of judgment in accordance with what Hunt believed to be true.

I thus deny Plaintiffs' motion to strike. I have also not considered most of what is contained in the Hunt and MacDonald affidavits, and I utilize all of Defendant's affidavits with great care and scrutiny according to the rules of evidence and procedure.

## Undisputed Facts

In November, 1994, Kristen Sullivan, an enlisted member of the United States Air Force on active duty, was placed by the decision of her commanding officer into the Air Force's Threatened Airman's Program (TAP). Immediately after reassignment to the TAP, Sullivan was abruptly and permanently reassigned from her duty station at Holloman Air Force Base, New Mexico. When she left New Mexico as required by the TAP assignment, Sullivan took with her the minor child Rebecca, but did not inform Kevin DeHaan, the child's father, that Rebecca was being relocated or where she could be found.

At the time of these occurrences, Sullivan was divorced from DeHaan. A stipulated final decree was entered in New Mexico on October 11, 1994. Stating that DeHaan was a "fit and proper parent," this decree awarded DeHaan and Sullivan joint custody of Rebecca. The decree also stated that each party would keep the other informed of an address and telephone number where "the children" could be reached and that Sullivan would notify DeHaan within seven days, if she received orders for relocation, but Sullivan failed to comply with these provisions.

Sullivan's commanding officer, Colonel James Hunt, refused to provide DeHaan with any information regarding Sullivan's relocation. Hunt had reassigned Sullivan to the TAP because of allegations that DeHaan had threatened and stalked Sullivan and had physically

9

harmed her both during the marriage and afterward. DeHaan denies all of these accusations, but Hunt states (by affidavit) that he believed at the time that Sullivan was in imminent and serious danger of physical harm and needed immediate protection from DeHaan. Hunt instructed Sullivan and others not to communicate with DeHaan about Sullivan's reassignment and not to assist DeHaan in finding his daughter. Even though DeHaan made Air Force personnel aware of pertinent provisions of the New Mexico divorce decree, Air Force personnel wilfully refused to help DeHaan find Sullivan or Rebecca, and as a result of his inability to get any information about how to contact Rebecca, DeHaan has been deprived of all contact with Rebecca for an extended period of time.

The TAP is a structured and distinguishable Air Force program created by the United States Air Force and conducted pursuant to an express statement of Air Force policy. The formal statement which describes the program and outlines its applicability and operation is designated an Air Force Instruction (AFI). This AFI and its attachments are referred to in the record interchangeably as "instructions," "rules," "guidelines," "regulations" and "directives." Whether the AFI constitutes an expression of legislative or administrative rules or regulations enacted pursuant to the Administrative Procedures Act which have the force and effect of law cannot be determined from what the parties provide. In any event, the TAP is described by the Air Force itself as an "assignment program" which "rapidly removes a person from a life threatening situation." AFI (Air Force Instruction) 36-2110, A (Attachment)12.1. AFI 36-2110 at Attachment 12 also states that certain procedures "do not apply to the portion of the threatened airman program (TAP) administered within AFOSI [Air Force Office of Special Investigations] channels, except for in-processing and out-processing instruction, " Id., but neither Plaintiffs nor

Defendant attempt to explain this terminology.

Attachment 12 includes a statement of additional circumstances where TAP is not to be utilized. These are: "threats between military personnel, between husband and wife, or when you know who is making the threat." It appears, however, that these recited circumstances are not to be regarded as binding exceptions, either absolute in nature or prohibitive of other approaches. While another section of the Attachment 12 states that the cited instances "do not justify approval" of reassignment to the TAP, yet another states: "As a condition for approval, the threat must *normally* be from an unknown source or by persons 'at large' and verified by the AFOSI." Id., A12.4.3.(Emphasis added.)

In describing the authority of a commander, TAP rules (or instructions) list "Commander Action" as: convening a meeting of certain named officials "to assess the case and determine appropriate action;" A12.4.1; deciding "whether to move the individual immediately to ensure his or her safety by sending the person TDY until they resolve the threat, or until receipt of assignment instructions;" A.12.4.2; and deciding "if reassignment is necessary" and providing factual information to other Air Force offices. A12.4.4. This same section states that a commander "Does not request PCS until you exhaust all other means of providing safety." Id.

## Plaintiffs' Postion

Defendant contends the regulations place the decision to move Sullivan and her daughter squarely within the definition of a discretionary function and excepts a claim for damages from the Federal Tort Claims Act. Plaintiffs, on the other hand, argue, first, that the regulations clearly preclude the acts complained of, and secondly, that the Federal Tort Claims Act permits them just compensation for the personal injuries which resulted from these acts.

11

By affidavit filed with his response to the pending motion, DeHaan denies unequivocally all allegations of harming or threatening Sullivan. At the same time, he argues that the TAP regulations cited do not apply to the present case because Sullivan's commanding officer could identify DeHaan as the individual accused of putting Sullivan at risk. In such a circumstance, DeHaan argues, the TAP reassignment is not available. He specifically refers to the regulation to establish his argument that "the Air Force may not use the Threatened Airman's program when the threats are made by a known person." When the threats are made by an identifiable person, DeHaan argues, "law enforcement authorities may take appropriate action" and intervention by the Air Force is not required.

DeHaan cites other parts of the Air Force's TAP regulations to demonstrate that the Air Force failed to follow its own rules. One portion of the regulation DeHaan relies on states: "As a basic condition for approval [for reassignment pursuant to the TAP], the threat must normally be from an unknown source or by persons 'at large' and verified by the AFOSI.'" AFI 36-2110 A12.4.3. DeHaan contends that the AFOSI (Air Force Office of Special Investigations) failed to verify allegations that DeHaan threatened or harmed Sullivan. DeHaan also argues that Defendant's failure to allege verification of the threats by the AFOSI defeats both the discretionary function defense and Defendant's pending motion. Compliance with its own regulations, DeHaan insists, is a necessary element of the discretionary function exception.

Additionally, DeHaan argues that the discretionary function exception is only available to governmental decisions based on public policy. In this case, he states, the regulations at sec. 2.2.8 expressly take "policy related issues" from a commanding officer and refer them to the Air Force Director of Personnel. DeHaan thus claims that Sullivan's commanding officer undertook

12

no more than implementation of TAP regulations, which excludes his actions from the discretionary function exception and makes them actionable pursuant to the Federal Tort Claims Act.

DeHaan pleads his case in negligence. He maintains that the United States intentionally violated the state court decree which afforded DeHaan joint custody, visitation rights and, in the event that her mother were transferred from Holloman Air Force Base, a right to know where his daughter was located. DeHaan terms the negligence alleged as negligence per se because he maintains that the state court orders have the force of law and the United States violated this law to DeHaan's ultimate harm. Additionally, DeHaan argues that the United States violated a Fourteenth Amendment right. He maintains that the Air Force owed him notice and a right to be heard before it took his daughter from him.

## Conclusions of Law

Viewing all facts and reasonable inferences in the light most favorable to the Plaintiff, the Plaintiff is unable to establish any claim or cause of action pursuant to the Federal Tort Claims Act. First, the placement of Kristen Sullivan into the Threatened Airman's Program was an authorized decision of her commander made in his discretion according to his best judgment under the facts as he understood them to be. Secondly, the decision by Sullivan's commander, whether he went about it correctly or not, was undertaken in furtherance of an Air Force policy explicit in the TAP. Therefore, the acts of which Plaintiff complains are outside the reach of the Federal Tort Claims Act and are subject to sovereign immunity. United States v. Varig Airlines, supra; United States v. Gaubert, supra; Berkovitz v. United States, supra.

Existence of the Threatened Airman's Program within the Air Force implicitly evidences an agency policy that (a) safety of personnel is to be given extremely high priority and (b)

13

extraordinary steps are to be taken when safety is at issue. The Air Force Instruction in line with this policy places responsibility with a commanding officer. The AFI not only describes the program as it is intended to protect Air Force personnel, it outlines procedures to be followed. Necessarily, however, these procedures are not absolute or mandatory beyond the exercise any discretion. To the contrary, the AFI evidences a decision to give a commander discretion in deciding when the TAP is appropriate or required. The rules or directives which govern the TAP thus allow for the exercise of judgment; and on its face, the AFI calls for the exercise of discretion. Which Air Force personnel are approved for reassignment to the TAP is left to a commander's best judgment. In such circumstances, it is not the place of the judicial branch to second-guess the administrative decision; and for this reason the Federal Tort Claims Act exempts discretionary acts. United States v. Gaubert, supra.

Nothing in the record suggests that the acts of Sullivan's commander were negligent. Whether or not they were negligent is immaterial. The defense of a discretionary function is available to Defendant without regard for negligence or possible negligence in the implementation of judgment and discretion. Id.; Barnson v. United States, 816 F.2d 549, 553 (10th Cir. 1987), *cert. denied* 108 S.Ct. 229 (1987); Hobdy v.United States, 968 F.2d 20 (10th Cir. 1992).

Even if the acts complained of were not excepted from the Federal Tort Claims Act as an exercise of discretion, the facts DeHaan presents, all viewed as true, cannot establish a case in negligence; and Plaintiff presents absolutely no law to support his arguments. Plaintiff suggests nothing to sustain his position that the United States or Air Force personnel were bound by a New Mexico divorce decree or that any duty was owed by the Air Force (1) to modify its operations or alter the judgment of its commanders to fit the terms of a state court divorce decree,

14

(2) to protect the private interests of Kevin DeHaan, or (3) to force a party to a stipulated decree of divorce to comply with its provisions.

Beyond the complete absence of any duty, the facts presented by DeHaan, taken as true, cannot establish a breach. Any obligation to keep DeHaan informed of his daughter's location or allow visitation with his daughter was Sullivan's. The choice to take Rebecca out of New Mexico had to be Sullivan's, as well. Because the state decree granted DeHaan joint custody, the only reasonable inference suggests that Sullivan could have left Rebecca with her father, and it could only have been Sullivan, not the Air Force, who decided otherwise. DeHaan does not contest the point, but argues the Air Force "aided and abetted." The argument, however, is completely misplaced in a civil claim of negligence; and whether the Air Force supported or enabled Sullivan's decision to take her minor daughter out of New Mexico is irrelevant.

DeHaan's cause of action thus lacks any evidence and any law to support the requisite elements of duty and breach. Beyond all doubt, DeHaan can prove no set of facts to support a case of negligence. Defendant is therefore entitled to a dismissal. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

DeHaan's arguments related to a deprivation of Fourteenth Amendment rights are also completely misplaced. He has pled no claim of a constitutional violation and cannot do so where he alleges jurisdiction pursuant to the Federal Tort Claims Act. Again, no set of facts could provide DeHaan with a claim against the United States for violation of constitutional rights, and Defendant is entitled to a dismissal. Id.

NOW, THEREFORE, IT IS ORDERED that Defendant's Motion to Dismiss and for Summary Judgment be granted. This case is to be dismissed with prejudice.

_____
SENIOR UNITED STATES JUDGE